# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | : : : : |
| Plaintiff, | : Civil Action No. |
| v. | : : : |
| BETTOR INVESTMENTS, LLC, and MATTHEW C. STUART, | : **JURY DEMAND** : : |
| Defendants. | : : : : : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), files this Complaint and alleges as follows:

## OVERVIEW

1.  This matter involves material misrepresentations and omissions of material facts made to individuals who invested money with Defendants Bettor Investments, LLC ("Bettor") and Matthew C. Stuart ("Stuart") (collectively, the "Defendants") to place legal wagers on sporting events, and share profits and losses on a pro-rata basis.

2. In 2015, Nevada enacted Senate Bill 443 ("NVSB 443"), which allowed entities to solicit and collect funds from investors anywhere in the world, aggregate those funds in a Nevada bank, place wagers on sporting events, and apportion profits and losses among investors.

3. In September 2015, Bettor was established to operate pursuant to NVSB 443.

4. Beginning in approximately March 2016, the Defendants, while acting pursuant to NVSB 443, raised funds from investors in various states.

5. In approximately November 2016, the Defendants began to operate outside the parameters of NVSB 443, by offering investors the opportunity to convert their previous investments with Bettor into promissory notes with Stuart.

6. In connection with their offerings, the Defendants made material misrepresentations and omissions to investors regarding the losses that Bettor had suffered, how losses would be apportioned amongst investors, the current value of their investments, the risks associated with their investments, Stuart's compensation, and the use of investor funds.

7. In approximately late 2016 and early 2017, the Defendants refunded some of the investors' investments and converted the remaining investors' investments into 12-month promissory notes issued by Stuart, with supposedly "guaranteed" rates of return.

8. However, as the Defendants well knew at the time, they had lost a significant portion of the investors' investments and did not have the funds necessary to satisfy their promissory note obligations to investors upon maturity, ultimately resulting in the collapse of their scheme.

## VIOLATIONS

9. The Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a), 5(c) and 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## JURISDICTION AND VENUE

10. The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

11. This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and

27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12. The Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint and made use of the mails and the means or instrumentalities of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this Complaint.

13. Venue is proper in this Court as certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the District of Nevada. Furthermore, Stuart resided within the District of Nevada from approximately September 2015 through July 2017.

14. The Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

15. Bettor was a Nevada limited liability company. It was registered on September 14, 2015, with its principal place of business in Reno, Nevada. It was

officially dissolved in July 2017.

16.     Stuart, 47 years-old, resides in Post Falls, Idaho, where he is employed as a dealer in a casino. Stuart was Bettor's Managing Member and its sole employee.

## THE OFFERINGS

### A.     The Initial Offering of Interests in Bettor

17.     After the enactment of NVSB 443 in June 2015, Stuart formed Bettor to enable him to solicit funds from investors and use those funds to wager.

18.     Bettor's website informed potential investors that it would use their combined funds to place wagers across multiple sporting events, apportion profits and losses amongst all investors on a *pro rata* basis, and charge them a business fee of 15% of the profits realized.

19.     The Defendants began to solicit and receive funds from investors to wager on sporting events in March 2016. They did not determine if any potential or actual investors were accredited investors, which was necessary to qualify for an exemption from registration of securities offerings under the Securities Act.

20.     Between March 2016 and November 2016, the Defendants raised a total of approximately $145,500 from approximately 70 investors in more than 20 states.

21.     In November 2016, after losing approximately $42,000 in investor funds from their wagering activities, the Defendants ceased making wagers in accordance with the framework established by NVSB 443.

22. At that time, the Defendants informed investors that their investments with Bettor could be redeemed or converted into promissory notes issued by Stuart.

23. However, the Defendants did not inform investors that Bettor had previously suffered wagering losses and that only approximately $75,500 of their original investments remained available at that time.

24. Rather, despite these losses, the Defendants misrepresented to investors that their investments had increased in value.

25. The Defendants falsely advised several investors that Bettor was "around 0.8% positive" when it ceased making wagers in accordance with NVSB 443 in November 2016, and sent notices to some of them that falsely depicted an overall increase in the values of their principal investments.

**B.    The Fraudulent Offering of Promissory Notes**

26. In December 2016, Stuart sent an e-mail to Bettor's investors, advising that he was "moving forward WITHOUT" the sports book he had previously used to place wagers and that doing so would make "other opportunities available" that he would discuss with them.

27. In the same email, Stuart advised that investments in Bettor could be redeemed or exchanged for promissory notes.

28. In an ensuing email, Stuart told investors that the 12-month promissory notes guaranteed 14% rates of return. If they converted, Stuart claimed that he would

use their previous investments with Bettor to place wagers on sporting events.

29. Stuart falsely assured potential promissory note holders that he could "guarantee the rates [on their promissory notes] because I have a positive track record of success without going crazy with risk" and that "I am very confident in my analytic models and number crunching to be able to offer rates of return."

30. Stuart also falsely assured potential promissory note holders that he would redeem their principal investments with Bettor, along with guaranteed profits, when their promissory notes became due.

31. However, Stuart failed to disclose to investors that Bettor had never generated any wagering profits from their original investments (and, in fact, had suffered significant losses), and that the Defendants had neither the collateral nor assets to support a guaranteed rate of return.

32. In 2016 and early 2017, the Defendants refunded approximately $70,000 to approximately 15 investors who elected not to convert their original investments with Bettor into promissory notes with Stuart, transferred approximately $19,000 to Stuart's personal bank account in two installments, and paid more than $2,000 in banking fees.

33. The approximately $70,000 refunded to investors represented the full amounts of their principal investments, plus a supposedly small "profit," even though Bettor had actually suffered losses of almost 30%. Thus, the Defendants did

not apportion the losses Bettor had suffered amongst all investors on a *pro-rata* basis, despite their previous assurances that they would do so. As a result, all of Bettor's losses were absorbed by those investors who chose to convert their original investments with Bettor into promissory notes with Stuart, unbeknownst to them.

34. In other words, the Defendants' material misrepresentations and omissions left investors unaware that their decisions regarding redemption or entering into promissory notes with Stuart was actually a choice between getting all of their money back plus a small profit (at least until Bettor's bank account was depleted) or having to rely upon Stuart to generate the massive returns necessary to pay promissory note holders the 14% returns he had guaranteed in 12 months, given the limited funds available to him with which to wager.

35. In January and February 2017, Stuart issued promissory notes in the total amount of approximately $120,000 to approximately 51 investors who chose to convert their original investments with Bettor into promissory notes with Stuart. The promissory notes included "guaranteed" rates of return of 14%.

36. The promissory notes collectively obligated Stuart to repay $136,800 to investors when their promissory notes became due, even though, as the Defendants well knew, they did not have the financial wherewithal to do so. Indeed, the Defendants had less than $15,000 remaining on-hand in investors' funds in January 2017, and only approximately $6,350 remaining on-hand in investors' funds

in February 2017.

37. Moreover, at least some of the approximately $19,000 in investors' funds that the Defendants transferred to Stuart were utilized by him for his personal expenses, contrary to the representations he had previously made to potential promissory note holders about how he would be compensated for his services.

38. Stuart had previously told potential promissory note holders that he would not take a management fee in connection with the promissory notes he issued to them, but would be compensated, instead, through subscription fees, seminars and consulting services that he would generate. Investors also believed that Stuart's compensation would include any profits generated in excess of their "guaranteed" 14% rates of returns on their promissory notes.

39. However, Stuart never generated or received compensation from subscription fees, seminars or consulting services. He also never generated the funds necessary to pay a 14% rate of return on the promissory notes he provided to investors, let alone a profit in excess of it.

40. Furthermore, although Stuart told potential promissory note holders that he would use their previous investments on deposit with Bettor to place wagers on sporting events, he also used them to place wagers on poker games, other table games, and slot machines, which was known to only a few of them.

41. In July 2017, a promissory note holder sent an e-mail to Stuart in which

he inquired about making an additional investment with Stuart. In it, the promissory note holder asked: "Are you meeting your obligations? I'd like to set up another account with you, perhaps. Do you share a balance sheet or anything that shows [where] you stand with assets and liabilities?"

42. In response, Stuart falsely assured the promissory note holder that "I have met ALL my obligations from prior contracts and expect to maintain that record," even though, as Stuart well knew, he could not reasonably expect to have the funds available to do so when they became due, since he owed approximately $136,800 when the promissory notes became due and only had approximately $517.57 remaining on-hand at that time with which to wager.

43. Stuart failed to repay any of the promissory note holders when their promissory notes became due in January and February 2018.

## COUNT I—UNREGISTERED OFFERING OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]

44. Paragraphs 1 through 43 are hereby re-alleged and incorporated herein by reference.

45. No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the transactions described herein.

46. Between on or about September 2015 and February 2018, the

Defendants:

(a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise; and

(b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or sell or offer to buy securities, through the use or medium of any prospectus or otherwise,

without a registration statement having been filed with the Commission as to such securities.

47. By reason of the foregoing, the Defendants, directly and indirectly, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II—FRAUD

### Violation of Section 17(a)(2) of the Securities Act
### [15 U.S.C. § 77q(a)(2)]

48. Paragraphs 1 through 43 are hereby re-alleged and incorporated herein by reference.

49. Between on or about September 2015 and February 2018, the Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by

use of the mails, directly and indirectly, obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, all as more particularly described above.

50. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### COUNT III—FRAUD

**Violation of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5]**

51. Paragraphs 1 through 43 are hereby re-alleged and incorporated herein by reference.

52. Between on or about September 2015 and February 2018, the Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instruments of interstate commerce and by use of the mails, directly and indirectly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53. The Defendants knowingly, intentionally, and/or recklessly made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct,

the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

54. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully prays for:

### **I.**

Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the Defendants committed the violations alleged herein.

### **II.**

A permanent injunction enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction, by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a)(2) of the Securities Act [15 U.S.C. §§ 77e(a), e(c) and q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

### III.

An order requiring the disgorgement by the Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

### IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against the Defendants.

### V.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: July 29, 2019

Respectfully submitted,

*/s/ Robert F. Schroeder*
Robert F. Schroeder
Senior Trial Counsel
Georgia Bar No. 001390
Email: SchroederR@sec.gov
Tel: (404) 942-0688

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Email: LoomisM@sec.gov
Tel: (404) 842-7622

COUNSEL FOR PLAINTIFF
U.S. Securities and Exchange Commission
950 East Paces Ferry Road NE, Suite 900
Atlanta, Georgia 30326-1382
Tel: (404) 842-7600
Fax: (404) 842-7666